## BAUER v INDUSTRIAL COMMISSION

Ohio Common Pleas, Stark Co

Decided June 3, 1938

Aungst, Snyder & Walsh, Canton, for plaintiff.

John Rossetti, Columbus, and Dean McLaughlin, Canton, for defendant.

### OPINION

By SWEITZER, J.

The only issue involved in this cause is: Did the employee, David C. Bauer, on the evening of July 23, 1934, at the plant of the Federal Refrigerating Company located

near Fairhope, Stark county, Ohio, sustain an accidental injury arising out of his employment, proximately contributing to his instant death? The Industrial Commission denied a claim for an award. It was filed by Mae E. Bauer, employee's widow. Later she died and employee's daughter was substituted as claimant and plaintiff.

The plaintiff contending she is entitled to participate in the state insurance fund appealed to this court. At the close of the introduction of evidence the court sustained the commission's motion asking a directed verdict in favor of the commission. Such verdict was returned. The cause is here at this time on plaintiff's motion for a new trial.

But four witnesses testified, Mae E. Bauer the widow, Dr. Clovis, the employee's attending physician, and Dr. McQuate, at the time county coroner, testifying for the claimant. Bernard N. Clark, employer's superintendent at the plant where the death occurred, testified for the commission.

The place of employment is just south of Fairhope, Stark county, Ohio. The plant where the death occurred is an electric refrigerating plant. Employee was one of several engineers, among a considerable number of employees who worked at the plant. He was about fifty years old, and had worked for the company as an engineer about fourteen years.

Employee's attending physician testified that employee, for about two and a half years preceding his death, had been suffering from a coronary occlusion, a heart disease; that he examined employee about January 3, 1932 and at that time "he was suffering with a coronary occlusion." The doctor continued to treat employee for this disease regularly until he died, and saw him just after his death. Dr. Clovis saw employee about two days before his death, also. The doctor was taking care of this patient regularly. His examination of this patient made about two days before patient's death revealed patient was "a man very sick", "sick from a coronary occlusion". About six months prior to employee's death, his physician prescribed six months absolute rest. The patient co-operated. "After a long period in bed plaintiff got up, improved, sitting in a chair, and he was able to go out in a car. That was when he died."

On July 23, 1934, the day employee died, he was taken in an automobile by his wife and another lady to Mansfield, Ohio, a distance of sixty or sixty-five miles to consult a heart specialist there located. Employee's attending physician had not advised this trip. Dr. Clovis testified, to a man in his condition, "any kind of exercise might be fatal." Dr. McQuate, county coroner testified in effect, this automobile trip to Mansfield, Ohio, in itself, was hazardous to a man in employee's condition. Dr. Clovis says his patient, also, had symptoms of coronary sclerosis. Employee's wife testified employee, while at the plant, standing and talking to some men, dropped dead about 8:15 P. M. of this same day, July 23, 1934. No post mortem was had.

Employee received word during the afternoon of July 23, 1934 at the doctor's office in Mansfield, from the plant superintendent, that employer's plant had stopped or broken down. Employee was returned by automobile to the plant from Mansfield at the suggestion of said superintendent. This return trip consumed approximately two hours, 5 P. M. to 7 P. M.

For some reason not accounted for, of the several persons who were preesnt at the plant from 7 P. M. to 8:15 P. M. during which interval employee dropped and died instantly, but two testified, Mrs. Bauer, widow of the employee testifying in plaintiff's behalf, and Mr. Clark, employee's superintendent, in defendant's behalf. Their testimony, as to occurrences surrounding the death, is hopelessly in conflict. Since the verdict was a directed one, Mrs. Bauer's version of occurrences, for the purpose of this motion, must be accepted as presenting the true situation.

According to Mrs. Bauer's testimony she and employee arrived at the plant about 7:00 P. M., remaining there until his death about 8:15 P. M. Thus, an hour and a quarter intervened between employee's arrival and his death. According to Mrs. Bauer the employee upon arrival from Mansfield, talked to some employees, took off his coat, went into the engine room from the storage, and up over the tanks, going up some steep steps, or stairs, transcript page 12. He went up and down these steps at least four times. He started the engine, that is, the ice machine, page 12 of the transcript. He pulled a switch or switches, and turned two valves two times. Her evidence fails to reveal whether the pulling of the switches and the turning of valves required muscular effort. The record does not show that any heavy muscular work of any kind was engaged in by employee. Mrs. Bauer says employee "hur-

ried"; also "that he walked hurriedly". "Hurried" and "walking hurriedly" are words and expressions more or less relative. While they constitute facts, yet to a large extent they are relative terms bordering on conclusions. Nowhere does Mrs. Bauer say that employe ran. She refers to him as "walking". It appears reasonable to assume from Mrs. Bauer's evidence that employee's muscular efforts were not extreme or heavy. Besides it apears she knew of her husband's very serious condition as result of heart disease. She knew he had been in bed for a long time, and that he just recently had become able to sit in a chair, to walk about and to ride in an automobile. It can scarcely be conceived that she, knowing this condition on the part of her husband, would acquiesce in his doing heavy work. There is no evidence of any caution or protest by her or by anyone against the type of work he performed. No doubt the most hazardous activity employee engaged in was going up and down the steps or stairs. From the evidence it must be concluded he went up and down these steps empty-handed, that is, he carried nothing up or down. Counsel for plaintiff in questions refer to the steps or stairs as ladders. Our recollection is, however, that witness makes no reference to ladders. This term seems to have been injected into questions without warrant by witness's answers.

Mrs. Bauer says further "After he was there and traced the trouble for them, it took only around 15 or 20 minutes to fix it and then they immediately started up, "he helped start the plant", transcript pages 16 and 17. Witness says the plant was running at the time employee dropped dead. He was standing in front of a switch board talking to three or four men. "I don't know what he was saying. I was at a distance. The only thing I know he talked, because he moved his hands and motioned. I was perhaps 30 feet from him, but he was explaining." Transcript page 16.

For what length of time Mr. Bauer had been standing in the position described, before he fell dead, is not disclosed by the evidence. At any rate, he was not engaged in activity other than standing and talking at the time he fell dead. From pages 18, 19 and 20 of the transcript, it appears Mrs. Bauer had personal knowledge to an extent, of the work performed by her husband at the plant on former occasions. In her testimony she leaves the impression she saw him in the perform-

ance of his work at times when the plant was running normally and also at times when the plant, in a state of break-down, required starting. Her testimony indicates there was little difference between the work she says she saw him perform on the evening of July 23, 1934, and that she saw him perform on these former occasions. The difference, which the testimony discloses between the work he performed on the day of his death and that performed on former occasions, consists of his working more hurriedly.

The two medical witnesses testified the work Mr. Bauer is described as doing between 7:00 P. M. and 8:15 P. M. contributed proximately to his death. In view of his disease common sense would indicate as much. If proximate contribution to death be the sole test of accidental injury and accidental death, as claimed by counsel for plaintiff, then the case should have been submitted to the jury.

The medical witnesses well might have testified, indeed it is believed one of them did testify in effect, riding to Mansfield and back in the automobile probably proximately contributed to employee's death.

The character of the disease coronary occlusion is but briefly explained by the evidence. There is no testimony, medical or lay, tending to prove employee prior to his death suffered trauma or "tear". Had the medical witnesses given as their opinion that employee preceding his death suffered trauma or "tear" as result of heavy or unusual work he was doing and that such trauma or "tear" contributed to his death, a different situation would confront us.

Where is there evidence of an accidental injury or circumstances, at law akin to an accidental injury? Where is there evidence to the effect employee's death resulted from "a tear" rather than from mere "wear", or constitutional heart disease.

Employee concededly had a long-standing serious heart disease. It was serious at least two and a half years previous to his death; how much longer is problematical. His physician was treating him for it regularly during all this period. There is no evidence the employee suffered trauma or "tear" the evening of his death. It is immaterial whether the heart disease was constitutional or was caused gradually from time to time, by his work as an employee. In either event the death would not be compensable as resulting from ac-

cidental injury. Claim is not made that employee died from an occupational disease.

If it be contended the mere sudden dropping to the floor, constitutes some evidence of accident, trauma or "tear" or raises an inference of an accident, a trauma or a "tear" such inference, if any, is entirely dispelled by plaintiff's own evidence to the effect employee had a heart disease of such character and severity that it was likely at any moment to cause his death naturally, in the very manner employee actually died.

It must be kept in mind the burden is on plaintiff to prove an accident, an accidental injury, an accidental death, or a situation at law, its equivalent, by a preponderance of the evidence.

Does the evidence present a situation wherein reasonable minds might reasonably differ as to whether employee's death resulted from "a tear", an accidental injury, or from "wear", heart disease? Would it not be difficult to conclude from the evidence there is even a scintilla of evidence of "a tear", an accident, an accidental death?

Certain decisions rendered by lower courts some years ago might justify submission of this case. However, such decisions never received the approval of the Supreme Court. A late case involving the question is, **Industrial Commission v Crawford, 126 Oh St 379**, in which the Supreme Court reversed the Court of Appeals of Montgomery County, on authority of **Industrial Commission v Middleton, 126 Oh St 212** and **Industrial Commission v Franken, 126 Oh St 299** approving the holding of the trial court in directing a verdict, **13 Ohio Law Abs 185**. Other cases in which the question is considered are: **Industrial Commission v Lambert, 126 Oh St 501, Industrial Commission v Nelson, 127 Oh St 41, Industrial Commission v Davis, 119 Oh St 821, Industrial Commission v Kane, 17 Ohio Law Abstract 644, Caseo v Industrial Commission 20 Ohio Law Abstract 161**, and **Industrial Commission v Bartholme, 128 Oh St 13**.

Applying the law shown by these cases, to the facts as revealed by plaintiff's witnesses, Mrs. Bauer, Dr. Clovis and Dr. Mc-Quate, does it not seem plaintiff has failed to prove by a preponderance of the evidence employee's death resulted from "a tear", an accident? Does the evidence not seem to point affirmatively even, to the conclusion employee died naturally from either a constitutional heart disease or a heart disease developed gradually over a long period of time to wit, "wear"?

Our Supreme Court recently, speaking through Judge Stephenson, defined the duty of trial judges in relation to directing verdicts. That prescribed duty may not be ignored, on the ground that directing a verdict is an unpleasant task. During the trial of the case the trial judge gave serious thought and study to both the evidence adduced and the law. With some reluctance he concluded the evidence and the law presented a situation where it became his unpleasant duty under the admonition of the Supreme Court, to direct the verdict later returned.

Plaintiff's motion for a new trial, also, raises the question of exclusion of competent evidence. No particular evidence of that sort is pointed out by plaintiff. The trial judge believes he was liberal in admitting evidence presented by plaintiff, and that there is no error in the record in that particular. Besides if the court's holding on the question of failure to prove an accidental death is correct the admission of such excluded evidence as is shown to have been proffered before the referee, would be of no avail to the plaintiff, under the circumstances obtaining.

Since the return of the verdict, the main question involved has been studied further; the transcript used at the trial has been re-read; the cases which led to the directing of a verdict have been analyzed and studied further; the court still is of opinion that under existing law, the plaintiff, with the burden on her, has failed to prove by the greater weight of the evidence, a compensable death. Accordingly plaintiff's motion for a new trial is denied.